IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION
No. 7:14-CV-235-D

| | | |
|---|---|---|
| CLAIRE H. PRIMROSE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **ORDER** |
| | ) | |
| CASTLE BRANCH, INC., | ) | |
| | ) | |
| Defendant. | ) | |

On October 17, 2014, Claire H. Primrose ("Primrose" or "plaintiff") filed a pro se complaint against Castle Branch, Inc. ("Castle Branch" or "defendant") [D.E. 1]. On January 5, 2015, Primrose amended her complaint, asserting violations of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681–1681x, as well as state law "libel and defamation" claims [D.E. 12]. On June 6, 2016, Castle Branch moved for summary judgment [D.E. 34] and filed a memorandum in support [D.E. 38], a statement of material facts [D.E. 37], and an appendix [D.E. 36]. On June 30, 2016, Primrose responded to Castle Branch's motion for summary judgment [D.E. 41], responded to Castle Branch's statement of material facts [D.E. 42], and filed an appendix [D.E. 43]. On July 13, 2016, Castle Branch replied [D.E. 44] and filed an additional exhibit [D.E. 45]. As explained below, the court grants Castle Branch's motion for summary judgment.

I.

Primrose resides in New Hanover County, North Carolina. Defs.' Stmt. Material Facts [D.E. 35] ¶ 5; Pl.'s Resp. Defs.' Stmt. Material Facts [D.E. 42] ¶ 5; Primrose Dep. [D.E. 37-1] 9. Castle Branch is a North Carolina corporation that performs background checks. Defs.' Stmt. Material Facts ¶¶ 1–2; Pl.'s Resp. Defs.' Stmt. Material Facts ¶¶ 1–2.

On August 3, 1993, Primrose pleaded guilty to multiple counts of misdemeanor forgery in New Hanover County. Ex. 13 [D.E. 37-11] 5–6, 8–12. The North Carolina Administrative Office of the Courts operates the Automated Criminal/Infraction System ("ACIS"), an online database of court records regarding criminal charges and convictions. Defs.' Stmt. Material Facts ¶ 115; Pl.'s Resp. Defs.' Stmt. Material Facts ¶ 115; Ex. 12 [D.E. 36-12] ¶ 18; Ex. 23 [D.E. 36-23] ¶ 18. When the North Carolina Administrative Office of the Courts entered Primrose's forgery convictions into ACIS, it erroneously entered one conviction as a conviction for common law robbery. Defs.' Stmt. Material Facts ¶ 77; Pl.'s Resp. Defs.' Stmt. Material Facts ¶ 77; Ex. 20 [D.E. 36-20] ¶ 6. The error went unnoticed for over 20 years. Defs.' Stmt. Material Facts ¶ 78; Pl.'s Resp. Defs.' Stmt. Material Facts ¶ 78; Ex. 20 at ¶ 6. On April 19, 2004, Primrose pleaded guilty to one count of misdemeanor worthless check in New Hanover County. Ex. 13 at 5.

From 2006 until 2015, Primrose worked as an accountant at the University of North Carolina at Wilmington ("UNCW"). Defs.' Stmt. Material Facts ¶ 10; Pl.'s Resp. Defs.' Stmt. Material Facts ¶ 10; Primrose Dep. 13. In 2010, Primrose enrolled in UNCW's Watson College of Education ("WCE") to pursue a Master of Arts in Teaching and a teacher's license. Defs.' Stmt. Material Facts ¶ 16; Pl.'s Resp. Defs.' Stmt. Material Facts ¶ 16; Primrose Dep. 37–40. In 2010, UNCW required Primrose to submit to a background check. Defs.' Stmt. Material Facts ¶ 11; Pl.'s Resp. Defs.' Stmt. Material Facts ¶ 11.[1] On June 23, 2010, Castle Branch issued a report which listed Primrose's convictions for forgery and passing a worthless check ("the first Castle Branch report"). Defs.' Stmt. Material Facts ¶ 12; Pl.'s Resp. Defs.' Stmt. Material Facts ¶ 12; Ex. 3 [37-3]. In reliance on the

---

[1] The record is unclear why UNCW requested the report. Primrose claims, without support, that UNCW requested the report when she applied for an on-campus job in 2010. Pl.'s Resp. Stmt. Material Facts ¶ 11. Notes created by WCE staff, however, suggest that UNCW requires the report when a student begins her "field experience." Ex. 9 [D.E. 37-8] 3. The dispute is not material.

2

ACIS record, that report also stated that Primrose had been convicted of common law robbery in New Hanover County. Defs.' Stmt. Material Facts ¶ 14; Pl.'s Resp. Defs.' Stmt. Material Facts ¶ 14; Ex. 3. Primrose has never been convicted of common law robbery.

In the spring semester of 2014, Primrose was enrolled in courses that, when completed, would allow her to graduate from WCE with a Master of Arts in Teaching. Defs.' Stmt. Material Facts ¶¶ 22, 25; Pl.'s Resp. Defs.' Stmt. Material Facts ¶¶ 22, 25; Primrose Dep. 49–50. Primrose also had completed all courses required to obtain her teacher's license, but still needed to complete one semester as a student-teaching intern to meet a "field experience" requirement. Defs.' Stmt. Material Facts ¶¶ 23–27; Pl.'s Resp. Defs.' Stmt. Material Facts ¶¶ 23–27; Primrose Dep. 49–50; Potts Dep. [D.E. 37-4] 15. Primrose did not plan to complete her field-experience requirement until the fall semester of 2014. Defs.' Stmt. Material Facts ¶¶ 28–29; Pl.'s Resp. Defs.' Stmt. Material Facts ¶¶ 28–29; Primrose Dep. 60. Instead, in the spring semester of 2014, Primrose planned to tutor middle-school students. Defs.' Stmt. Material Facts ¶¶ 28–29; Pl.'s Resp. Defs.' Stmt. Material Facts ¶¶ 28– 29.

On February 6, 2014, WCE hosted an internship-application meeting, which Primrose attended to discuss her application for an internship in the fall semester of 2014. Ex. 9 [D.E. 37-8] 2. WCE required all WCE students to attend an internship-application meeting before completing the field- experience requirement. Defs.' Stmt. Material Facts ¶ 42; Pl.'s Resp. Defs.' Stmt. Material Facts ¶ 42. During the internship-application meeting, WCE staff told Primrose that she would "need to submit to a new formal background check." Ex. 9 at 2. Certiphi, Inc. ("Certiphi"), a competitor of Castle Branch, would perform that background check. Defs.' Stmt. Material Facts ¶¶ 46–48; Pl.'s Resp. Defs.' Stmt. Material Facts ¶¶ 46–48. WCE students were "required to sign up for and pay for [the] background report to be completed by Certiphi." Defs.' Stmt. Material Facts

3

¶ 43; Pl.'s Resp. Defs.' Stmt. Material Facts ¶ 43. WCE also instructed students to complete a self-disclosure questionnaire. Ex. 9 at 2.

On February 7, 2014, Primrose completed a self-disclosure questionnaire, including answering questions about her criminal background. Id. at 14–15; Ex. 10 [D.E. 37-9] 2–3. In response to a question asking if Primrose had been discharged or dismissed from a job, Primrose responded that she had, and disclosed that she was dismissed from a job because of conduct which resulted in a forgery charge. Ex. 10 at 2. In response to a question that asked if she had ever been convicted of a crime, she answered "no"; however, in response to a question that asked if she had ever entered a plea of guilty, Primrose stated that she had pleaded guilty to one count of misdemeanor forgery. Id. Primrose did not disclose her convictions for passing worthless checks, believing those matters were resolved through civil fines rather than criminal convictions. Id.; Pl.'s Resp. Defs' Stmt. Material Facts ¶ 58. On February 19, 2014, Primrose ordered a background check from Certiphi. Primrose Dep. 56–57; Ex. 13.

On or about February 20, 2014, Primrose attended a "Background Check review" meeting with Cindy Wiseman, WCE's Director of Professional Experiences, and Stephanie Glowa, WCE's Field Experience Coordinator. Ex. 9 at 2. The three discussed Primrose's criminal background, and Wiseman told Primrose that, in light of her criminal history as shown in a background report that WCE had on file, Primrose must provide "a letter of explanation" of her prior convictions and a copy of her court records. See Defs.' Stmt. Material Facts ¶¶ 35–36; Pl.'s Resp. Defs.' Stmt. Material Facts ¶¶ 35–36; Primrose Dep. 52–53; Ex. 9 at 3. Primrose protested that the report WCE had on file was inaccurate, and Wiseman encouraged Primrose to contact Certiphi to resolve any issues. Ex. 9 at 3. Wiseman also told Primrose that Primrose would have to submit to another background check before she could begin her internship. Id. Wiseman and Glowa agreed that they would not

4

submit Primrose's background check to the middle school where Primrose planned to tutor students until resolving the dispute regarding her background check. Id.

On February 26, 2014, Certiphi issued a background report on Primrose to WCE ("the first Certiphi report"). Ex. 13. That report included Primrose's convictions for forgery and worthless checks, as well as the erroneously listed conviction for common law robbery. Id. at 5–6. The report contained a screenshot from ACIS. Id. at 8–9; Ex. 14 [D.E. 37-12] ¶¶ 4–8. The screenshot showed that the ACIS database contained an entry for Primrose's erroneously listed common law robbery conviction. Ex. 13 at 8. Primrose did not review the first Certiphi report until March 11, 2014. Defs.' Stmt. Material Facts ¶ 53; Pl.'s Resp. Defs.' Stmt. Material Facts ¶ 53; Primrose Dep. 61.

Dr. Ann Potts, WCE's Associate Dean for Teacher Education, compared the Certiphi report with Primrose's self-disclosure form and considered Primrose's disclosure insufficient because "there was a mismatch between the Certi[phi] document and her self disclosure." Potts Dep. 36. Specifically, Dr. Potts saw that Primrose had answered "no" when asked if she had been convicted of a crime, "and then when we got the background check we saw there was [sic] guilty charges on there." Id. at 34.

On February 24, 2014, Carol McNulty, WCE's Associate Dean for Academic and Student Affairs, ordered another background report, this time from Castle Branch, to resolve disputes concerning Primrose's criminal background and the Certiphi report. Defs.' Stmt. Material Facts ¶¶ 64, 66; Pl.'s Resp. Defs.' Stmt. Material Facts ¶¶ 64, 66; Ex. 15 [D.E. 37-13] 2. On March 6, 2014, Castle Branch issued a background report on Primrose ("the second Castle Branch report"). Defs.' Stmt. Material Facts ¶ 67; Pl.'s Resp. Defs.' Stmt. Material Facts ¶ 67; Ex. 2 [D.E. 37-2]. The second Castle Branch report also stated that Primrose had been convicted of common law robbery,

5

forgery, and passing a worthless check. Defs.' Stmt. Material Facts ¶¶ 69–70; Pl.'s Resp. Defs.' Stmt. Material Facts ¶¶ 69–70; Ex. 2.

On March 11, 2014, Primrose met with WCE staff, including Dr. Potts, "to review her formal background check and self disclosure statement and [the] mismatch between the two." Potts Dep. 47. Dr. Potts believed that "a mismatch" existed because Primrose said she had not been convicted of a crime, but the report stated otherwise. Id. at 48. At that meeting, the WCE staff dismissed Primrose from WCE's Master of Arts in Teaching program "for failure to disclose her criminal background history." Defs.' Stmt. Material Facts ¶¶ 89, 91; Pl.'s Resp. Defs.' Stmt. Material Facts ¶¶ 89, 91; Ex. 9 at 12–13. Although Primrose disputed the accuracy of the background reports, WCE staff told her that they could "only act upon the documents that [they] ha[d] in hand," and "should her criminal background history change" she could apply for readmission. Ex. 9 at 13. On March 11, 2014, Primrose reviewed the second Castle Branch report for the first time. See Defs.' Stmt. Material Facts ¶ 74; Pl.'s Resp. Defs.' Stmt. Material Facts ¶ 74; Primrose Dep. 72, 75.

On March 12, 2014, WCE permitted Primrose to provisionally re-enroll in WCE's Master of Arts in Teaching program. Defs.' Stmt. Material Facts ¶ 94; Pl.'s Resp. Defs.' Stmt. Material Facts ¶ 94. Before she provisionally re-enrolled on March 12, 2014, Primrose could not attend class or contact her professors. Defs.' Stmt. Material Facts ¶ 97; Pl.'s Resp. Defs.' Stmt. Material Facts ¶ 97; Primrose Dep. 119–20.

On March 17, 2014, an unknown individual at the New Hanover County courthouse edited Primrose's criminal record in ACIS, changing the conviction for common law robbery to a misdemeanor conviction for passing a worthless check. Defs.' Stmt. Material Facts ¶ 131; Pl.'s Resp. Defs.' Stmt. Material Facts ¶ 131.

6

On or shortly after April 1, 2014, WCE formally reinstated Primrose into WCE's Master of Arts in Teaching program. Defs.' Stmt. Material Facts ¶ 95; Pl.'s Resp. Defs.' Stmt. Material Facts ¶ 95; Primrose Dep. 119. On April 8, 2014, Primrose authorized UNCW to send the second Castle Branch report to the schools where she hoped to intern. Defs.' Stmt. Material Facts ¶ 75; Pl.'s Resp. Defs.' Stmt. Material Facts ¶ 75; Primrose Dep. 88–89. On or about April 9, 2014, Primrose received a corrected report from Certiphi ("the corrected Certiphi report"). Defs.' Stmt. Material Facts ¶ 102; Pl.'s Resp. Defs.' Stmt. Material Facts ¶ 102. This report did not list a charge for common law robbery. Id.

On April 9, 2014, Primrose contacted Castle Branch and disputed the common law robbery conviction listed in the second Castle Branch report. Defs.' Stmt. Material Facts ¶ 108; Pl.'s Resp. Defs.' Stmt. Material Facts ¶ 108; Primrose Dep. 103–04. Castle Branch reinvestigated Primrose's criminal background and issued a new report ("the third Castle Branch report") that did not contain any conviction for common law robbery, but did include an additional misdemeanor conviction for passing a worthless check. Defs.' Stmt. Material Facts ¶¶ 109–22; Pl.'s Resp. Defs.' Stmt. Material Facts ¶¶ 109–22.

On April 10, 2014, Castle Branch sent Primrose a letter incorrectly stating that the second Castle Branch report had been correct; however, Castle Branch attached to the letter a copy of the third Castle Branch report, which contained the corrected information. Defs.' Stmt. Material Facts ¶¶ 122–24; Pl.'s Resp. Defs.' Stmt. Material Facts ¶¶ 122–24. Also, on April 10, 2014, Castle Branch emailed UNCW's Dean of Students about the third Castle Branch report. Defs.' Stmt. Material Facts ¶ 125; Pl.'s Resp. Defs.' Stmt. Material Facts ¶ 125. The email incorrectly stated that the second Castle Branch report had correctly stated Primrose's criminal history; however, the email contained a link to the corrected third Castle Branch report, and at least three members of UNCW's

7

staff accessed the third Castle Branch report "multiple times." Defs.' Stmt. Material Facts ¶¶ 125–27; Pl.'s Resp. Defs.' Stmt. Material Facts ¶¶ 125–27; Ex. 12 ¶¶ 26–28. The language Castle Branch "used in the April 10, 2014 letter was a mistake and was not intentional." Ex. 23 ¶ 24. The letter was saved into Castle Branch's file for Primrose, and therefore when Primrose called to speak with Castle Branch employees to dispute the findings of the reinvestigation, Castle Branch's employees mistakenly repeated the inaccurate statement in the cover letter. Defs.' Stmt. Material Facts ¶ 124; Pl.'s Resp. Defs.' Stmt. Material Facts ¶ 124.

Primrose began her field-experience internship in the fall semester of 2014. Defs.' Stmt. Material Facts ¶ 134; Pl.'s Resp. Defs.' Stmt. Material Facts ¶ 134. WCE removed Primrose from the program in October 2014 for reasons unrelated to Castle Branch's conduct or Primrose's criminal background. Defs.' Stmt. Material Facts ¶¶ 134–51; Pl.'s Resp. Defs.' Stmt. Material Facts ¶¶ 134–51. Primrose never completed the internship program, but in December 2014 she graduated from WCE with a Master of Arts in Teaching. Defs.' Stmt. Material Facts ¶¶ 150, 154; Pl.'s Resp. Defs.' Stmt. Material Facts ¶¶ 150, 154. In January 2015, Primrose obtained a provisional teaching license, which allows her to teach in North Carolina public schools, and Primrose has taught in North Carolina public schools since the spring of 2015. Defs.' Stmt. Material Facts ¶¶ 155–56; Pl.'s Resp. Defs.' Stmt. Material Facts ¶¶ 155–56; Primrose Dep. 35.

II.

Summary judgment is appropriate if the moving party demonstrates "that there is no genuine dispute as to any material fact" and the moving party "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment must initially show an absence of a genuine dispute of material fact or the absence of evidence to support the nonmoving party's case. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). If a moving party meets its burden, the

8

nonmoving party must "come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (quotation and emphasis omitted). A genuine issue for trial exists if there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). "The mere existence of a scintilla of evidence in support of the plaintiff's position [is] insufficient . . . ." Id. at 252; see Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985) ("The nonmoving party, however, cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another."). Only factual disputes that might affect the outcome under substantive law preclude summary judgment. Anderson, 477 U.S. at 248. In reviewing the factual record, the court views the facts in the light most favorable to the nonmoving party and draws reasonable inferences in that party's favor. Matsushita, 475 U.S. at 587–88.

III.

Primrose alleges that Castle Branch violated the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681–1681x, by issuing and failing to correct an inaccurate background report. See Am. Compl. [D.E. 12]. The FCRA concerns consumer reporting agencies. The term "consumer reporting agency," or CRA, means:

> any person which, for monetary fees, dues, or on a cooperative non-profit basis, regularly engages in whole or in part in the practice of assembling or evaluating consumer credit information or other information on consumers for the purpose of furnishing reports to third parties, and which uses any means or facility of interstate commerce for the purpose of preparing or furnishing consumer reports.

15 U.S.C. § 1681a(f). Castle Branch is a CRA. Defs.' Stmt. Material Facts ¶¶ 3–4; Pl.'s Resp. Defs.' Stmt. Material Facts ¶¶ 3–4.

The FCRA contains two civil liability provisions. See Yohay v. City of Alexandria Emps. Credit Union, Inc., 827 F.2d 967, 971 (4th Cir. 1987). Under section 1681o, a consumer may

9

recover actual damages resulting from a CRA's negligent failure to comply with the FCRA.[2] A consumer must prove actual damages to recover for a negligent violation of the FCRA. Guimond v. Credit Bureau Inc., 955 F.2d 41, at *2 (4th Cir. 1992) (per curiam) (unpublished table decision). "Actual damages do not include nominal damages under the FCRA." Davenport v. Sallie Mae, Inc., 124 F. Supp. 3d 574, 581 (D. Md.) (quotation omitted), aff'd, 623 F. App'x 94 (4th Cir. 2015) (per curiam) (unpublished).

Under section 1681n, a CRA may be liable for actual or statutory damages and punitive damages for "willful" failures to comply with the FCRA. 15 U.S.C. § 1681n(a);[3] see Berry v.

---

[2] 15 U.S.C. § 1681o provides:

(a) In general

Any person who is negligent in failing to comply with any requirement imposed under this subchapter with respect to any consumer is liable to that consumer in an amount equal to the sum of--

(1) any actual damages sustained by the consumer as a result of the failure; and

(2) in the case of any successful action to enforce any liability under this section, the costs of the action together with reasonable attorney's fees as determined by the court.

(b) Attorney's fees

On a finding by the court that an unsuccessful pleading, motion, or other paper filed in connection with an action under this section was filed in bad faith or for purposes of harassment, the court shall award to the prevailing party attorney's fees reasonable in relation to the work expended in responding to the pleading, motion, or other paper.

15 U.S.C. § 1681o.

[3] 15 U.S.C. § 1681n(a) provides:

(a) In general

Any person who willfully fails to comply with any requirement imposed under this

10

Schulman, 807 F.3d 600, 605 (4th Cir. 2015); Saunders v. Branch Banking & Trust Co., 526 F.3d 142, 149 (4th Cir. 2008); Ausherman v. Bank of Am. Corp., 352 F.3d 896, 899–900 (4th Cir. 2003). To prove willfulness under the FCRA, a consumer must show that the defendant knowingly or recklessly disregarded the FCRA's requirements. See Safeco Ins. Co. of Am. v. Burr, 551 U.S. 47, 57, 68–69 (2007); Berry, 807 F.3d at 605; Ausherman, 352 F.3d at 900; Dalton v. Capital Associated Indus., Inc., 257 F.3d 409, 418 (4th Cir. 2001). To survive summary judgment, a plaintiff must support a willful-noncompliance claim with evidence that the violation was willful, not merely negligent or careless. See Robinson v. Equifax Info. Servs., LLC, 560 F.3d 235, 241 n.3 (4th Cir. 2009); Dalton, 257 F.3d at 418; Casella v. Equifax Credit Info. Servs., 56 F.3d 469, 476 (2d. Cir. 1995).

A.

Primrose claims that Castle Branch failed to comply with section 1681b(b), which describes conditions for furnishing and using consumer reports for employment purposes. See 15 U.S.C.

---

subchapter with respect to any consumer is liable to that consumer in an amount equal to the sum of--

(1)(A) any actual damages sustained by the consumer as a result of the failure or damages of not less than $100 and not more than $1,000; or

(B) in the case of liability of a natural person for obtaining a consumer report under false pretenses or knowingly without a permissible purpose, actual damages sustained by the consumer as a result of the failure or $1,000, whichever is greater;

(2) such amount of punitive damages as the court may allow; and

(3) in the case of any successful action to enforce any liability under this section, the costs of the action together with reasonable attorney's fees as determined by the court.

15 U.S.C. § 1681n(a).

11

Case 7:14-cv-00235-D   Document 47   Filed 01/03/17   Page 11 of 19

§ 1681b(b). Under section 1681b(b)(2), before furnishing a consumer report for employment purposes, a CRA must obtain certification from the employer that the preparation of the consumer report has been disclosed to the consumer who is the subject of the report, and that the consumer has authorized in writing that the employer may procure the consumer report. See id. § 1681b(b)(2). A report is issued for "employment purposes" if it is "used for the purpose of evaluating a consumer for employment, promotion, reassignment or retention as an employee." Id. § 1681a(h).

"[A] pro se complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." Erickson v. Pardus, 551 U.S. 89, 94 (2007). Nevertheless, "[o]nly those questions which are squarely presented to a court may properly be addressed." Weller v. Dep't of Soc. Servs., 901 F.2d 387, 391 (4th Cir. 1990).

Even under the standard governing pro se complaints, Primrose has not plausibly alleged a violation of section 1681b(b). Rather, both her initial complaint and her amended complaint allege that Castle Branch's report contained false and defamatory information, and that Castle Branch refused to correct the report once notified of the inaccurate information. See Compl. [D.E. 1]; Am. Compl. Neither complaint alleges that Castle Branch created a report for employment purposes, nor do they allege that Castle Branch created an unauthorized report. Primrose did not plead a violation of section 1681b(b). Moreover, in light of the deadline in the scheduling order [D.E. 16], Primrose cannot use her brief opposing Castle Branch's motion for summary judgment to add such a claim. See, e.g., Hexion Specialty Chems., Inc. v. Oak-Bark Corp., No. 7:09-CV-105-D, 2011 WL 4527382, at *7–10 (E.D.N.C. Sept. 28, 2011) (unpublished) (collecting cases holding that a party cannot use briefing in support of or in opposition to summary judgment to amend its complaint); Fed. R. Civ. P. 16(b)(4). Thus, the court grants summary judgment to Castle Branch on Primrose's claim under section 1681b(b).

12

B.

Primrose claims that Castle Branch failed to comply with 15 U.S.C. § 1681d(a)(1) because it "prepared an investigative consumer report" without disclosing the investigation to Primrose in writing and receiving her authorization to produce the report. [D.E. 41] 3–4. Section 1681d applies only to "investigative consumer reports." See 15 U.S.C. § 1681d(a)(1). An "investigative consumer report" is "a consumer report ... in which information on a consumer's character, general reputation, personal characteristics, or mode of living is obtained through personal interviews." 15 U.S.C. § 1681a(e). Castle Branch's reports involved neither personal interviews nor reports on Primrose's character, reputation, or personal characteristics. Rather, Castle Branch's reports summarized the contents of various public records. See Exs. 2 [D.E. 37-2], 3 [D.E. 37-3], 4 [D.E. 36-4]. Thus, Castle Branch's reports were not "investigative consumer reports," and the court grants summary judgment to Castle Branch on Primrose's claim under section 1681d(a)(1).

C.

Primrose claims that Castle Branch violated 15 U.S.C. § 1681i. Section 1681i(a)(1)(A) requires that, if a consumer disputes the "accuracy of any item of information contained in a consumer's file" and the consumer notifies the CRA of the dispute, the CRA must reinvestigate the information. 15 U.S.C. § 1681i(a)(1)(A). If unable to confirm its accuracy, the CRA must either note the current status of the disputed information or delete the information within 30 days. Id. The CRA must "provide written notice to a consumer of the results of a reinvestigation under this subsection not later than 5 business days after the completion of the reinvestigation, by mail or, if authorized by the consumer for that purpose, by other means available to the agency." Id. § 1681i(a)(6)(A).

13

On April 9, 2014, Primrose contacted Castle Branch and disputed the common law robbery conviction in the second Castle Branch report. On April 10, 2014, Castle Branch sent a letter to Primrose and an email to UNCW incorrectly stating that the second Castle Branch report had been correct, but attaching a copy of the corrected third Castle Branch report. Even assuming that Castle Branch failed to provide written notice to Primrose as required by section 1681i(a)(6)(A), the record contains no evidence suggesting that Castle Branch's error was willful. See Berry, 807 F.3d at 605; Robinson, 560 F.3d at 241 n.3; Ausherman, 352 F.3d at 900; Dalton, 257 F.3d at 418; Casella, 56 F.3d at 576. Indeed, that Castle Branch sent the corrected third Castle Branch report along with the inaccurate cover letter and email shows that Castle Branch was not willfully attempting to misrepresent Primrose's criminal history. Rather, the Castle Branch employee who handled the matter testified that Castle Branch "mistakenly" used the wrong response in the cover letter and email after correcting Primrose's report. Therefore, the court grants summary judgment to Castle Branch on Primrose's willfulness claim under section 1681i.

To prove a negligent violation of section 1681i, Primrose must show that she suffered "actual damages." See 15 U.S.C. § 1681o; Guimond, 955 F.2d 41, at *2; Davenport, 124 F. Supp. 3d at 581. Primrose's claims for actual damages, however, are not causally related to Castle Branch's alleged failure to follow proper notification procedures after it reinvestigated Primrose's record. Rather, Primrose's claims for actual damages all involve the reactions of third parties who believed that Primrose had been convicted of common law robbery. See Ex. 30 [D.E. 36-30]. Castle Branch's failure to inform Primrose that the original report had been inaccurate did not cause those alleged harms. Rather, the record shows that Castle Branch provided UNCW staff, an accurate, corrected report and that UNCW staff, in fact, viewed that corrected report on multiple occasions. Furthermore, Primrose's claims for damages all concern events that occurred before April 9, 2014,

14

the date when she notified Castle Branch that she disputed its report. Therefore, the court grants summary judgment to Castle Branch concerning the alleged negligent failure to follow the reinvestigation procedures in section 1681i.

D.

Primrose claims that Castle Branch violated section 1681e(b) of the FCRA, which requires a CRA to follow "reasonable procedures to assure the maximum possible accuracy" of its reports. 15 U.S.C. § 1681e(b). In support, Primrose cites Castle Branch's reliance on the ACIS system's report that Primrose had been convicted of common law robbery.

Although the statute uses the language "maximum possible accuracy," section 1681e(b) requires a CRA to follow reasonable procedures, not infallible procedures, and a CRA may reasonably rely on a court's electronic database. See Childress v. Experian Info. Solutions, Inc., 790 F.3d 745, 746–47 (7th Cir. 2015). Here, the North Carolina Administrative Office of the Courts maintains the ACIS system, and that system erroneously stated that Primrose had been convicted of common law robbery. Moreover, the record demonstrates that Castle Branch had no reason to know of—or even suspect—ACIS's error until April 9, 2014. Indeed, Castle Branch "ha[d] never had a problem with the accuracy of records obtained via ACIS" until Primrose's case. Defs.' Stmt. Material Facts ¶ 118; Pl.'s Resp. Defs.' Stmt. Material Facts ¶ 118. Certiphi, a company that also created a consumer report on Primrose's criminal background in 2014, also relied on ACIS and reported the same erroneous conviction. Defs.' Stmt. Material Facts ¶¶ 117–18; Pl.'s Resp. Defs.' Stmt. Material Facts ¶¶ 117–18; Ex. 13 at 8–12. On April 9, 2014, after Castle Branch became aware that Primrose disputed the common law robbery conviction, Castle Branch corrected the report and sent UNCW an email with a link containing the corrected report. Defs.' Stmt. Material Facts

15

¶¶ 125–26; Pl.'s Resp. Defs.' Stmt. Material Facts ¶¶ 125–26. Thus, the court grants summary judgment to Castle Branch concerning the alleged violation of section 1681e(b).

E.

Finally, Primrose cannot show actual damages that would support recovery under section 1681o. A plaintiff's claim under section 1681o cannot survive summary judgment unless the record contains evidence of actual damages caused by the defendant's negligent violations of the FCRA. See Davenport, 124 F. Supp. 3d at 581; Spector v. Experian Info. Servs. Inc., 321 F. Supp. 2d 348, 356 (D. Conn. 2004). Primrose's claims for damages broadly fall into two categories: emotional distress damages and damages resulting from her temporary dismissal from WCE. See Ex. 30.

As for emotional distress damages, Primrose alleges that she suffered actual damages in the form of "embarrassment, humiliation, depression, stress, anguish, anxiety, fear, lack of sleep, lack of appetite . . . . extreme emotional distress . . . . [and] [d]eliberate infliction of emotional harm." Id. at 3. "Actual damages [under the FCRA] may include not only economic damages, but also damages for humiliation and mental distress." Sloane v. Equifax Info. Servs., LLC, 510 F.3d 495, 500 (4th Cir. 2007). Although a plaintiff's testimony by itself "can provide sufficient evidence to support an emotional distress award," the Fourth Circuit requires the testimony to "sufficiently articulate true demonstrable emotional distress." Id. at 503 (alteration and quotation omitted). A plaintiff's testimony "must indicate with specificity how the plaintiff's alleged distress manifested itself" and "must also show a causal connection between the [FCRA] violation and her emotional distress." Bryant v. Aiken Reg'l Med. Ctrs. Inc., 333 F.3d 536, 547 (4th Cir. 2003) (alteration and quotations omitted). "Demonstrable" emotional distress refers to emotional distress which leads to externally observable occurrences like physical symptoms or a diagnosis from a medical professional. See id.; Dennis v. Columbia Colleton Med. Ctr., Inc., 290 F.3d 639, 653 (4th Cir.

16

2002). A plaintiff's emotional distress must have been directly caused by the FCRA violation and not by the denial of a benefit for which the initial credit report was sought. See Dennis, 290 F.3d at 653.

Primrose's claims for emotional distress damages recite the sort of generalized emotional state that, if proven, is not the specific, demonstrable emotional distress required to recover emotional distress damages under the FCRA. Primrose's claims do not "indicate with specificity how [her] alleged distress manifested itself." Bryant, 333 F.3d at 547 (quotation omitted); cf. Robinson, 560 F.3d at 240–41; Sloane, 510 F.3d at 503–04. Rather, they speak broadly about mental states like embarrassment, or lack of appetite. Moreover, a psychologist, psychiatrist, or other mental health professional has never evaluated Primrose, much less diagnosed her with anxiety, depression, or any other condition. See Primrose Dep. 31–32. Furthermore, according to Primrose, her emotional distress occurred as a result of third parties believing that she had committed common law robbery, rather than the direct results of the inaccurate report itself. Therefore, even if Primrose testified to the facts alleged in her claims for emotional distress damages, a reasonable jury would not have a legally sufficient basis to find that she suffered emotional distress damages as a result of Castle Branch's alleged FCRA violations.

Primrose also alleges damages arising from her temporary dismissal from WCE. However, even if the court assumes without deciding that WCE dismissed Primrose because of the erroneously listed common law robbery conviction, and not because of other "mismatches" between her self-disclosure and the second Castle Branch report, no actual damages occurred. Specifically, on March 11, 2014, WCE dismissed Primrose. When dismissed, Primrose could not attend classes or contact her professors. On March 12, 2014, WCE permitted Primrose to provisionally re-enroll and she did so. From March 12 through April 1, 2014, Primrose was allowed to attend classes and contact her

17

professors. On April 1, 2014, WCE fully reinstated Primrose. Primrose concedes that the temporary dismissal did not affect her ability to intern in the fall of 2014, or her ability to graduate, and the record contains no evidence that Primrose suffered any damages as a result of her temporary dismissal. In fact, Primrose graduated from WCE. Furthermore, although Primrose did not complete the internship, she concedes that this failure "was not related to Castle Branch's conduct or the ... background report in any way." Defs.' Stmt. Material Facts ¶¶ 150–51; Pl.'s Resp. Defs.' Stmt. Material Facts ¶¶ 150–51. Currently, Primrose has a teaching license and has taught in North Carolina public schools since the spring of 2015. Defs.' Stmt. Material Facts ¶¶ 155–57; Pl.'s Resp. Defs.' Stmt. Material Facts ¶¶ 155–57.

Primrose has failed to produce sufficient facts from which a jury would have a legally sufficient basis to conclude that she suffered any actual damages as a result of her temporary dismissal from WCE. Thus, the court grants summary judgment to Castle Branch on Primrose's claims under section 1681o.

IV.

As for Primrose's state law "libel and defamation" claims,[4] the FCRA provides that except for the specified remedies provided for in the FCRA,

> no consumer may bring any action or proceeding in the nature of defamation ... against any consumer reporting agency ... based on information disclosed by a user of a consumer report to or for a consumer against whom the user has taken adverse action, based in whole or in part on the report[,] except as to false information furnished with malice or willful intent to injure such a consumer.

---

[4] Under North Carolina law, defamation includes libel and slander. See Market Am., Inc. v. Christman-Orth, 135 N.C. App. 143, 149–52, 520 S.E.2d 570, 576–77 (1999). Libel is defined as a written defamation. Id. at 149, 520 S.E.2d at 576. Slander is defined as spoken defamation. Id. at 151, 520 S.E.2d at 577.

18

15 U.S.C. § 1681h(e); see Ross v. F.D.I.C., 625 F.3d 808, 813–17 (4th Cir. 2010). Under North Carolina law, libel and slander are "in the nature of defamation." Beattie v. Nations Credit Fin. Servs. Corp., 69 F. App'x 585, 590 & n.7 (4th Cir 2003) (per curiam) (unpublished) (analyzing libel under South Carolina law as "in the nature of defamation" under section 1681h(e)); Market Am., Inc., 135 N.C. App. at 149–52, 520 S.E.2d at 576–77. Here, no rational jury could find that Castle Branch furnished any false information with malice or willful intent to injure Primrose. See, e.g., Ross, 625 F.3d 813–17. Accordingly, Primrose's "libel and defamation" claims are preempted, and the court grants summary judgment to Castle Branch.

V.

In sum, the defendant's motion for summary judgment [D.E. 34] is GRANTED. Defendant may file a motion for costs in accordance with the Federal Rules of Civil Procedure and this court's local rules. The clerk shall close the case.

SO ORDERED. This 3 day of January 2017.

JAMES C. DEVER III
Chief United States District Judge